Tammy A. Tsoumas (SBN 250487)
tammy.tsoumas@kirkland.com
Matthew Summers (SBN 311324)
matthew.summers@kirkland.com
Leonora A. Cohen (SBN 319463)
lena.cohen@kirkland.com
KIRKLAND & ELLIS LLP
2049 Century Park East
Los Angeles, CA 90067
Telephone: (310) 552-4200
Facsimile: (310) 552-5900

*Attorneys for Defendant*
*The Boeing Company*

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| WEINTRAUB FINANCIAL SERVICES, INC. and SEBITNA, LLC<br><br>        Plaintiffs,<br><br>    v.<br><br>THE BOEING COMPANY<br><br>    Defendant. | Case No. 2:20-cv-03484-FLA-GJS<br><br>Hon. Fernando L. Aenlle-Rocha<br><br>**DEFENDANT THE BOEING COMPANY'S NOTICE OF MOTION AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**<br><br>Hearing Date:   July 22, 2022<br>Time:           1:30 p.m.<br>Courtroom:      6B |

**TO ALL PARTIES AND TO THEIR ATTORNEYS OF RECORD**:

**PLEASE TAKE NOTICE** that on July 22, 2022 at 1:30 p.m., or as soon thereafter as the matter may be heard in Courtroom 6B of the United States District Court for the Central District of California, located at 350 West 1st Street, Los Angeles, California 90012, Defendant The Boeing Company ("Boeing") will and hereby does move for summary judgment pursuant to Federal Rule of Civil Procedure 56.

This motion is made following the conference of counsel pursuant to L.R. 7-3 which took place on June 7, 2022.

Boeing's Motion is based on this Notice of Motion and Motion; the accompanying Memorandum of Points and Authorities in support of this Motion; the Declaration of Leonora Cohen and accompanying exhibits in support thereof; the pleadings and papers on file; any oral argument that may be presented at a hearing in this matter; and any other matters this Court wishes to consider.

DATED: June 17, 2022                    Respectfully submitted,

                                        _/s/ Tammy A. Tsoumas_
                                        Tammy A. Tsoumas
                                        Matthew Summers
                                        Leonora A. Cohen

                                        _Attorneys for Defendant_
                                        THE BOEING COMPANY

# **TABLE OF CONTENTS**

I.  STATEMENT OF RELEVANT FACTS .................................................2

    A.  Plaintiffs, Their Purchase Agreement, and Their Environmental
    Investigation of the Property.................................................2

    B.  Boeing and Its Nexus to the Property...................................4

    C.  Butler Contacts Boeing and Boeing Promptly Begins Investigating
    the Environmental Issues at the Property ...........................5

    D.  Boeing Meets with Plaintiffs and Presents Its Initial Findings.......6

    E.  Boeing Attempts to Negotiate a Cost-Sharing Proposal with Mr.
    Butler ...................................................................7

    F.  In the Meantime, the Purchase Agreement Terminates After
    Plaintiffs Refused to Close and Mr. Butler Declined to Extend the
    Agreement ............................................................9

    G.  Plaintiffs Sue Butler for the Demise of the Purchase Agreement.10

II.  PROCEDURAL HISTORY.......................................................10

III.  LEGAL STANDARD ..........................................................11

IV.  PLAINTIFFS' REMAINING CLAIM FAILS AS A MATTER OF
    LAW....................................................................12

    A.  Butler Did Not Breach Its Contract with Plaintiffs By Refusing to
    Close the Sale .......................................................13

        1.  Plaintiffs Refused to Close the Deal, Not Butler .................13

        2.  Plaintiffs Offer No Evidence That Butler Breached the
        Agreement.....................................................14

        3.  The Purchase Agreement Terminated Pursuant to Its
        Terms..........................................................15

    B.  Plaintiffs Cannot Demonstrate Causation or Interference Because
    the Alleged Interfering Act Did Not Occur....................................16

i

**DEFENDANT THE BOEING COMPANY'S NOTICE OF MOTION AND MEMORANDUM OF
POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

C.      Boeing Did Not Cause Butler to Breach the Purchase
        Agreement .......................................................................... 19

D.      Plaintiffs Also Do Not Have Evidence Sufficient to Show that
        Boeing Intentionally Induced a Breach .......................................... 22

V.    BOEING CANNOT BE LIABLE WHEN IT WAS ACTING IN ITS
      LEGITIMATE BUSINESS INTERESTS ................................................. 24

VI.   CONCLUSION ....................................................................... 27

**DEFENDANT THE BOEING COMPANY'S NOTICE OF MOTION AND MEMORANDUM OF
POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Baez v. Pension Consulting Alliance, Inc.*,
    2018 WL 1942389 (C.D. Cal. Mar. 16, 2018)..............................................19, 21

*Bank of N.Y. v. Fremont Gen. Corp.*,
    523 F.3d 902 (9th Cir. 2008) .......................................................................19

*Cabanas v. Gloodt Assocs.*,
    942 F. Supp. 1295 (E.D. Cal. 1996) ..........................................................24, 25

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986)......................................................................................11

*Christian Legal Soc. v. Martinez*,
    561 U.S. 661 (2010)......................................................................................18

*Computer Place, Inc. v. Hewlett-Packard Co.*,
    607 F. Supp. 822 (N.D. Cal. 1984) ...............................................................25

*Davis v. Nadrich*,
    174 Cal. App. 4th 1 (2009) ..........................................................15, 16, 22, 23

*Dryden v. Tri–Valley Growers*,
    65 Cal. App. 3d 990 (1977) ..........................................................................19

*Family Home & Fin. Ctr., Inc. v. Fed. Home Loan Mortg. Corp.*,
    461 F. Supp. 2d 1188 (C.D. Cal. 2006) *("Family Home I")*..................12, 16, 22

*Family Home & Fin. Ctr., Inc. v. Fed. Home Loan Mortg. Corp.*,
    525 F.3d 822 (9th Cir. 2008)  ("*Family Home II*")...............................12, 22, 24

*Fazio v. City & Cnty. of San Francisco*,
    125 F.3d 1328 (9th Cir. 1997) ......................................................................12

*Franklin v. Dynamic Details, Inc.*,
    116 Cal. App. 4th 375 (2004) .......................................................................12

*Hahn v. Diaz–Barba*,
    194 Cal. App. 4th 1177 (2011) .....................................................................19

iii

*Integrated Healthcare Holdings, Inc. v. Fitzgibbons*,
    140 Cal. App. 4th 515 (2006) ...................................................................16

*Kasparian v. Cnty of Los Angeles*,
    38 Cal. App. 4th 242 (1995) .....................................................................22

*Korea Supply Co. v. Lockhheed Martin Corp.*,
    29 Cal. 4th 1134 (2003) ...........................................................................22

*Labertew v. Chartis Prop. Cas. Co.*,
    363 F. Supp. 3d 1031 (D. Ariz. 2019) .............................................18, 21

*Mossimo Holdings, LLC v. Haralambus*,
    2017 WL 1240739 (C.D. Cal. Apr. 4, 2017) ...........................................13

*Nat'l Funding, Inc. v. Commercial Credit Counseling Services, Inc.*,
    2018 WL 6444899 (C.D. Cal. Nov. 6, 2018) ...........................................19

*In re Oracle Corp. Sec. Litig.*,
    627 F.3d 376 (9th Cir. 2010) ....................................................................12

*Quelimane Co. v. Stewart Title Guaranty Co.*,
    19 Cal. 4th 26 (1998) ...............................................................................24

*Reyes v. Becker*,
    59 F.3d 176 (9th Cir. 1995) ......................................................................16

*Rosenfeld v. Cohen*,
    146 Cal. App. 3d 200 (1983) ....................................................................22

*Rutherford v. Owens-Illinois, Inc.*,
    16 Cal. 4th 953 (1997) .............................................................................19

*SIC Metals, Inc. v. Hyundai Steel Co.*,
    838 F. App'x 315 (9th Cir. 2021) *("SIC II")*...........................................22

*SIC Metals, Inc. v. Hyundai Steel Co.*,
    442 F. Supp. 3d 1251 (C.D. Cal. 2020) *("SIC I")*...........................22, 24, 25, 26

*Stereoscope, LLC v. U.S. Bank Nat'l Ass'n*,
    675 F. App'x 725 (9th Cir. 2017) ......................................................19, 20

*TYR Sport, Inc. v. Warnaco Swimwear, Inc.*,
    709 F. Supp. 2d 802 (C.D. Cal. 2010) ..............................................12, 23, 24

**DEFENDANT THE BOEING COMPANY'S NOTICE OF MOTION AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

*Wasco Prods., Inc. v. Southwall Tech., Inc.*,
  435 F.3d 989 (9th Cir. 2006) ...............................................................13

*Weststeyn Dairy 2 v. Eades Commodities Co.*,
  280 F. Supp. 2d 1044 (E.D. Cal. 2003) .............................................25

*Winchester Mystery House, LLC v. Global Asylum, Inc*,
  210 Cal. App. 4th 579 (2012) ............................................................23

*Wynn v. Nat'l Broadcasting Co., Inc.*,
  234 F. Supp. 2d 1067,1121-22 (C.D. Cal. 2002)...............................19

**Rules**

Fed. R. Civ. P. 11 ...................................................................................11

Fed. R. Civ. P. 56(a)...............................................................................11

**Other Authorities**

Rest. 2d Torts § 766 ..........................................................................23, 24

**DEFENDANT THE BOEING COMPANY'S NOTICE OF MOTION AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

This action has been troubled since its inception. It is premised on a legal theory that is inconsistent with the theory that Plaintiffs Weintraub Financial Services, Inc. ("WFS") and Sebitna, LLC ("Sebitna") advanced in a previous litigation. It relies on allegations that are belied by evidence known to Plaintiffs at the time they filed it. Plaintiffs have been forced to re-plead their complaint multiple times, and the Court previously dismissed all but one of the claims. Even as to that claim—for intentional interference with contractual relations—the Court noted that the allegations supporting it appear to be "intentionally vague, or even misleading, regarding certain details," (Dkt. 26 at 11), and that summary judgment may ultimately be appropriate. Now that discovery is closed, it is clear that Plaintiffs have failed in their attempt to fabricate tort liability in a case that involves nothing more than The Boeing Company's reasonable, common sense efforts to act in its legitimate business interests. Plaintiffs' ill-conceived legal gambit has run its course and should consume no additional judicial resources.

The crux of Plaintiffs' one remaining claim is that Boeing intentionally interfered with Plaintiffs' contract to purchase 21200 Victory Boulevard in Woodland Hills, California (the "Property") from Butler Enterprises ("Butler") by causing Butler to refuse to close the sale in breach of the contract. But discovery has confirmed that Plaintiffs do not have evidence sufficient to create a genuine issue of material fact regarding multiple elements of their claim, including the following:

- Plaintiffs contend **Butler breached** the contract by "refus[ing] to close the sale," (Dkt. 33 (Fourth Amended Complaint or "4AC") ¶ 32). To the contrary, Plaintiffs' representative, Richard Weintraub, testified that "*Sebitna* . . . made the decision not to close on June 3rd, 2013," *not* Butler, (SUF 75), and Butler repeatedly informed Plaintiffs that it was "ready, willing, and able to close the escrow by the required date." SUF 61.

- Plaintiffs contend **Boeing committed the allegedly interfering act**. Specifically, Plaintiffs allege that Boeing conditioned its participation in the environmental investigation and remediation of the Property on Butler contributing $5,000,000 to an environmental escrow account and Boeing

**DEFENDANT THE BOEING COMPANY'S NOTICE OF MOTION AND MEMORANDUM OF
POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

receiving an "unlimited and continuing" guarantee from Weintraub and Butler. Discovery has proven both claims false.

- Plaintiffs contend **Boeing** was the moving factor **causing** the alleged breach. To the contrary, Plaintiffs submitted in the previous state court action that they could not perform on the contract due "***entirely***" to **Butler's** "own breaches, misrepresentations and omissions," and Mr. Butler testified that (i) his relationship with Plaintiffs soured independent of Boeing, (ii) he nevertheless would have closed the deal pursuant to the Purchase Agreement if Plaintiffs had performed, and (iii) he declined to extend the escrow period further because Plaintiffs threatened to sue him.

- Plaintiffs contend **Boeing intended to cause** the breach. In fact, Boeing did not even know enough about the Purchase Agreement to know **how** to interfere with Butler's performance of it, let alone actually intend to do so.

Each of these four evidentiary deficiencies independently justifies granting Boeing's motion and bringing this case to an end. Moreover, the undisputed facts also show that Boeing consistently acted in its legitimate business interest and therefore cannot be held liable for intentional interference with contract, as a matter of law.

Accordingly, for all of these reasons, which are discussed further below, Plaintiffs' only remaining claim in this action should be dismissed.

## I.    STATEMENT OF RELEVANT FACTS

### A.    Plaintiffs, Their Purchase Agreement, and Their Environmental Investigation of the Property

Plaintiffs are shell companies for Richard and Liane Weintraub, who identify themselves as sophisticated real estate developers based in Los Angeles. Separate Statement of Uncontroverted Facts ("SUF") 1. In November 2010, WFS entered into an agreement to purchase the Property from a non-party entity associated with the late Frank Butler called Butler Enterprises for $21.5 million plus 10% of all "monies, benefits," or other income or profits received by Plaintiffs in connection with the Property (the "Purchase Agreement" or "Agreement"). SUF 2. The Property had housed Mr. Butler's yacht manufacturer (Catalina Yachts) since 1974. SUF 3. According to Plaintiffs, "[t]he

2

goal of the Agreement was to permit WFS to purchase the Property, convert the permitted use of the Property from industrial to residential . . ., build residences upon the Property, and share 10% of the proceeds with Butler Enterprises."  SUF 4.

In addition to the price, pertinent terms of the contract included that: (i) Plaintiffs were required to deposit $21.5 million at least three days before the escrow closing date; (ii) if escrow had not closed by the closing date, the escrow company was required to terminate the escrow, unless the buyer and seller agreed to extend the escrow in writing; and (iii) Butler had the right to terminate escrow if Plaintiffs failed to pay any of their obligations under the Agreement when due. SUF 5. The deal remained in escrow for approximately two-and-a-half years. SUF 6.  Due to multiple amendments to the Agreement for extensions of time, the final escrow closing date was June 3, 2013. *Id*.

One factor driving the need for extensions was that Plaintiffs repeatedly delayed conducting a Phase II environmental assessment (SUF 7), which was necessary for residential development (SUF 9).[1] The Phase II assessment was recommended by the Phase I Environmental Site Assessment ("Phase I Report") that Plaintiffs received as part of Butler's disclosures when Plaintiffs first agreed to purchase the Property in 2010. SUF 8. The Phase I Report had identified potential areas of environmental concern, including solvent impacts at areas of the Property where only Catalina Yachts had operated, and accordingly, the Report recommended further investigation. SUF 10. Although Plaintiffs' lead project manager, Mr. John J. ("J.J.") O'Brien, repeatedly recommended that Plaintiffs promptly conduct a thorough Phase II assessment (SUF 11, 12), and while Mr. Butler also expressed concern about the delay (SUF 13), Plaintiffs waited until September 2012—nearly two years into the escrow period—to conduct a Phase II

---

[1] A Phase I Environmental Site Assessment is regularly completed as part of a commercial real estate transaction in order to assess whether property uses have impacted the soil or groundwater and could pose a threat to the environment and/or human health. If areas of concern are identified, a Phase II Environmental Site Assessment will typically be conducted to analyze whether a property complies with regulatory standards.

3

assessment, and even then, performed only a limited Soil and Soil Vapor Assessment (the "Phase II Report") that did not investigate all of the solvents identified in the Phase I Report. SUF 14, 15. By Plaintiffs' own admission, the Phase II Report also did not assess the cause of any soil impacts; it assessed only the condition of the Property. SUF 16. Nevertheless, even this limited assessment—like the Phase I Report—found soil impacts in areas where Catalina Yachts alone had operated, as well as in areas of the Property where the Rocketdyne Division of Rockwell International Corp. ("Rocketdyne") had built rocket engines for NASA and the Department of Defense from approximately the mid-1960s to 1971, after which Butler bought the Property. SUF 19. The Phase II Report thus recommended further investigation. SUF 17.

### B.    Boeing and Its Nexus to the Property

Boeing was not a party to the Purchase Agreement, privy to the negotiations of the contract or its subsequent amendments, or informed of basic terms of the contract such as the purchase price. SUF 18. Boeing's only nexus to the Property was that it acquired Rocketdyne in around 1996. SUF 19. In connection with this acquisition, Boeing performed environmental investigation on the portion of the Property where Rocketdyne had operated, which was supervised by the applicable regulator, the Los Angeles Regional Water Quality Control Board (the "Water Board"). SUF 20. In particular, in November 1996, Boeing conducted a detailed assessment of the Property. *Id*. Although Boeing found some trace solvents near the footprint of the Rocketdyne building, none exceeded regulatory limits for industrial use at the time. SUF 21. The Water Board's experts then confirmed in a February 18, 1998 letter (the "1998 No Further Action Letter") that no further action (including remediation) was required at the Property for the ongoing industrial uses. *Id*. There are no records from that time that reflect whether there were any agreements between Boeing and Butler that led up to the 1996 assessment.

4

**DEFENDANT THE BOEING COMPANY'S NOTICE OF MOTION AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

### C. Butler Contacts Boeing and Boeing Promptly Begins Investigating the Environmental Issues at the Property

After the Water Board issued its 1998 No Further Action Letter, Boeing had no further involvement with the Property until approximately 15 years later when Mr. Butler approached Boeing in December 2012 to discuss "what needs to be done" with respect to potential environmental remediation at the Property related to Plaintiffs' efforts to convert the Property to residential use. SUF 22. Boeing promptly responded. Within a week of Mr. Butler's initial outreach, Boeing requested and obtained the Phase II Report from Mr. Butler and started "determin[ing] next steps." SUF 23. In addition, Boeing began to investigate internally what work it had previously performed on the Property, what information was available about the Property's condition, any agreements it had with the property owner, and what the scope of Boeing's potential obligations were with respect to further remediation. SUF 24. Boeing also retained an environmental consultant to assist with its investigation. SUF 25. Among the information collected as part of Boeing's investigation were public agency reports that, as Plaintiffs admit, showed "that Catalina Yachts in fact had improper environmental management practices, that Catalina Yachts used [industrial solvent] TCE in its operations, and that Catalina Yachts' practices potentially caused contamination of the Property, including TCE contamination." SUF 26.

Boeing also sent Mr. Butler questions on January 29, 2013 to "better understand [Mr. Butler's] expectations" "before [Boeing] c[ould] commit to any additional action." SUF 27. Specifically, Boeing wanted to assess: (i) what environmental impacts had been detected on the Property; (ii) the sources of those environmental impacts and whether any were attributable to Rocketdyne; and (iii) the parameters of the work being requested from Boeing. SUF 28. Butler forwarded Boeing's email to Plaintiffs to enlist their help in providing responses. SUF 29. Mr. O'Brien responded to Mr. Weintraub (SUF 30 (emphasis added)):

5

**DEFENDANT THE BOEING COMPANY'S NOTICE OF MOTION AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

Overall, I assess the Boeing email to Frank Butler favorably. Of course they are trying to limit their exposure, but the note is an ***appropriate, rational and technical response*** to the conclusions of the Phase Two report. . . . Taken at face value, the Boeing email is an attempt to ga[u]ge the reasonableness of Catalina Yachts. . . . Boeing's email seeks to determine if Catalina wants to draw in Boeing on all contamination.

After multiple follow-ups *by Boeing*, Mr. Butler responded approximately *two months* later on March 27 with only partial information. SUF 31. Mr. Butler made clear that while "Catalina Yachts [was] only requesting, at [that] time, that [Boeing] remediate all contaminants of concern ('COCs') . . . in the area of the former in-ground vapor degreaser," where Rocketdyne had operated, "to residential cleanup standards," Catalina Yachts reserved the right "to request additional investigation and remediation of the site." *Id*. As a result, Boeing understood the scope of Mr. Butler's request to potentially extend beyond the degreaser area and thus, to be "open-ended." SUF 32.

## D.    Boeing Meets with Plaintiffs and Presents Its Initial Findings

Following Mr. Butler's March 27 email, Mr. Butler allowed for Boeing and Plaintiffs to speak directly so that Boeing could get a better understanding of the scope of the project, the plans for additional environmental investigations (if any), and next steps. SUF 33. At this point, Boeing was still in its early stages of fact finding and trying to understand what was being asked of it. SUF 34. On April 19, 2013, Boeing and Plaintiffs met to discuss the issues, at which time Plaintiffs conveyed that "the only environmental issue relate[d] to the former degreaser area" and "expressed interest in having Boeing take the lead on any additional environmental investigation/cleanup coordination with the agencies." SUF 36.  Plaintiffs' request did not account for the fact that the Phase I and Phase II Reports had plainly identified Catalina Yachts as contributing to contamination at the Property. Boeing informed Plaintiffs that it was difficult to understand how Boeing was involved, given that: (i) Boeing had very limited information regarding Rocketdyne's or Catalina Yachts' operations at the Property; and (ii) there were "regulatory documents indicating that TCE usage occurred by Catalina Yachts." *Id*. Boeing stated that it "could

6

not commit to leading the investigation of non-Rockwell sources and obtaining [a No Further Action letter ("NFA")] for other people's contamination." SUF 37. Nevertheless, Boeing and Plaintiffs agreed to continue their dialogue and exchange documents, including the agency reports and the Phase I Report. SUF 38.

After Boeing sent Plaintiffs the agency documents revealing Catalina Yachts' TCE usage, Mr. Weintraub confronted Mr. Butler with them. Mr. Butler then confessed that "he knew of such contamination but that [Plaintiffs] could never prove it," and that "he was worried that Catalina's operations may have been a source of TCE contamination because he was aware that there has been a chemical spill of TCE that went into a foundation crack in the production area of one of the [Catalina Yachts] buildings." SUF 39, 40.

### E.   Boeing Attempts to Negotiate a Cost-Sharing Proposal with Mr. Butler

In response to Mr. Butler's request that Boeing "perform certain environmental investigation and remediation work" and Plaintiffs' request for "a letter from Boeing agreeing to some cleanup responsibility," Boeing sent Mr. Butler a letter on April 26, 2013, copying Plaintiffs. SUF 41. As Boeing had informed Plaintiffs on April 19, it still had limited information regarding the scope of contamination attributable to Rocketdyne, as opposed to Butler's operations. SUF 37. Specifically, as of April 26, the only records Boeing had regarding the environmental condition of the Property since its 1996 investigation were the Phase I and Phase II Reports and the agency documents, all of which indicated that Catalina Yachts may have significantly contributed to contamination at the Property, but to an unknown extent. SUF 42. Nevertheless, Boeing's letter enclosed a proposal to share the costs with Catalina Yachts and the Frank Butler Trust to obtain a site-wide NFA from the Water Board to residential standards for the Property, since that was what Boeing understood Mr. Butler to be requesting and what Plaintiffs would need for their development. SUF 44.

Boeing's April 26 proposal provided that (i) Boeing would perform the environmental investigation and remediation work necessary to apply for a NFA based on residential standards for the area of the Property in which Rocketdyne had operated an in ground degreaser; (ii) Catalina Yachts would perform the environmental investigation and remediation work necessary to apply for a NFA for the principal area in which it had operated; (iii) Boeing and Catalina Yachts would equally split the cost of the investigation outside of these areas, but Boeing would perform the work; and (iv) following the Property sale, the Frank Butler Trust would put $5 million in an environmental escrow account that would be used to fund the work allocated to Catalina Yachts and the Frank Butler Trust that was necessary to obtain an NFA for the Property, with any remaining funds returned to the Frank Butler Trust. SUF 45, 46. Boeing believed that the escrow account needed to be established upon sale of the Property because Mr. Butler was elderly and potentially moving out of state, and initial discussions contemplated Boeing performing all of the work contemplated by the April 26 proposal. SUF 47. The escrow account would ensure that funds would be available to reimburse Boeing for work performed on behalf of Catalina Yachts. *Id.* Boeing offered to discuss the proposal with Mr. Butler in its cover letter (SUF 45), and separately made the same offer to Plaintiffs the next business day. SUF 49.

Plaintiffs never responded to Boeing's offer to discuss the proposal, but Boeing and Mr. Butler discussed it in the following weeks. SUF 49, 50. Contemporaneous notes reflect that Mr. Butler was "receptive to the Boeing 4/26 proposal, but asked if Boeing would be flexible with the $5m environmental 'escrow account.'" SUF 50. Mr. Shestag, one of Boeing's representatives, "agreed that Boeing could be flexible with the value of the account." SUF 51. Mr. Shestag also explained that the purpose was "to make sure [both Boeing and Catalina Yachts] pay [their] fair share of the investigation/clean up." SUF 52. They also discussed next steps to investigate the extent and source of the

**DEFENDANT THE BOEING COMPANY'S NOTICE OF MOTION AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

environmental impacts in that meeting, which they undertook in the following months and years. SUF 53.

Boeing and Butler continued to discuss cost allocation for many months and reached multiple interim cost allocation agreements as the investigation progressed (SUF 54). In February 2014, they also discussed a revised version of the April 26 proposal, but did not reach an agreement. SUF 55. Ultimately, Boeing did not perform work on behalf of Catalina Yachts, as contemplated in the April 26 proposal; instead, each party conducted and paid for its own work. SUF 57. Boeing also did not coordinate with the Water Board on behalf of Catalina Yachts. Instead, in August 2013, the Water Board determined that each party was responsible for its respective areas and each conducted investigation and remediation independently except where their collaboration was necessary. SUF 58.

### F.    In the Meantime, the Purchase Agreement Terminates After Plaintiffs Refused to Close and Mr. Butler Declined to Extend the Agreement

In May 2013, approximately one month before escrow was scheduled to close, Plaintiffs informed Butler that the "environmental issues" attributable to Catalina Yachts had "become an impediment to the financing for the transaction" and that they "underst[oo]d that Boeing [was] prepared to remedy the environmental issues that [were] its responsibility, at its cost," so they "remain[ed] interested in trying to see if the transaction [could] be saved." SUF 59. Plaintiffs thus requested "an additional six month extension of the closing date of the transaction." *Id.*

During the next month, Butler and Plaintiffs attempted, but failed, to negotiate an extension of the escrow period. SUF 60, 61. Butler informed Plaintiffs on May 10, 15, and 23 that it was "***ready, willing, and able to close the escrow by the required date***." SUF 61. Nevertheless, Butler informed Plaintiffs that it would agree to extend the escrow period if Plaintiffs agreed to pay a certain amount, waived claims against Butler, and agreed not to conduct further testing at the Property without Butler's approval. SUF 62. Plaintiffs refused because they were unwilling to waive their claims. *Id.* Mr. Butler was

9

upset that Mr. Weintraub "threatened to sue" him, apparently over Butler's failure to disclose Catalina Yachts' contribution to contamination at the Property, so Butler declined to grant Plaintiffs' request for a fourth extension of the escrow period. SUF 63. Accordingly, the escrow terminated and the Agreement was not completed. SUF 64.

### G.   Plaintiffs Sue Butler for the Demise of the Purchase Agreement

Following Mr. Butler's refusal to extend the escrow, Plaintiffs sued Butler and several affiliated entities (the "Butler Defendants") for fraud, negligent misrepresentation, breach of contract, and breach of the implied covenant of good faith and fair dealing, among other claims (the "*Butler* Litigation").  SUF 65.  In that lawsuit, Plaintiffs represented to the state court that the deal fell through because (i) ***Butler*** falsely represented the source and extent of chemical contamination of the Property by maintaining that Butler had no responsibility for such contamination, and (ii) ***Butler*** fraudulently concealed information evidencing otherwise (namely, the evidence that Boeing shared with Plaintiffs at the April 19, 2013 meeting).  SUF 66. Key to their argument was that the Butler Defendants had breached the Purchase Agreement by failing to provide the regulatory documents that ***Boeing*** presented to Plaintiffs at the April 19, 2013 meeting. SUF 67. Plaintiffs relied heavily on ***Boeing's*** evidence in their complaint and summary judgment briefing, along with evidence that Boeing never actually said it would take sole responsibility for impacts caused by Catalina Yachts. SUF 68. Plaintiffs did not name Boeing in this suit and did not otherwise advance any arguments claiming that Boeing was responsible for the deal falling through. SUF 65.

The court ultimately credited this evidence, and Plaintiffs defeated the Butler Defendants' summary judgment motion. SUF 69. Thereafter, Plaintiffs and the Butler Defendants settled for a substantial amount in April 2018.

## II.   PROCEDURAL HISTORY

Approximately one year after Plaintiffs settled their lawsuit against Butler, Plaintiffs filed the instant action alleging three claims: intentional interference with

**DEFENDANT THE BOEING COMPANY'S NOTICE OF MOTION AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

prospective economic relations, negligent interference with prospective economic relations, and intentional interference with contractual relations. Dkt. 1-1. After Plaintiffs twice amended their complaint, changing their theory from initially claiming that Boeing interfered with the Purchase Agreement by reporting Catalina Yacht's contamination to the Water Board (Dkt. 1-2 ¶¶ 9-10) to their current claims (Dkt. 26 at 17), Boeing moved to dismiss their Second Amended Complaint ("SAC"). Dkt. 20. Judge Michael W. Fitzgerald, then presiding, granted Boeing's motion on Plaintiffs' claims for negligent and intentional interference with prospective economic relations, finding that Plaintiffs did not sufficiently allege that Boeing committed an independently wrongful act (an element of both of those claims). Dkt. 26. The Court, however, allowed Plaintiffs' claim for intentional interference with contractual relations to proceed, but warned that "*the SAC appears to be intentionally vague, or even misleading,* regarding certain details" and that various "inconsistences. . . *conceivably could support a quick granting of summary judgment combined with sanctions under Rule 11*." *Id.* at 11-12 (emphasis added).

The Court's concerns about Plaintiffs' remaining claim were right; as shown below, this case is utterly frivolous, and summary judgment should be granted, as should Boeing's pending Motion for Sanctions Pursuant to Federal Rule of Civil Procedure 11 ("Rule 11 Motion"). Further, Plaintiffs' litigation abuses unfortunately have not been limited to their pleadings, and as a result, Boeing has brought a Motion for Evidentiary and Monetary Sanctions due to Plaintiffs' spoliation of evidence, which is also pending.

## III.   LEGAL STANDARD

Summary judgment is appropriate where the evidence shows "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Boeing meets its burden on this motion by "pointing out an absence of evidence supporting [Plaintiffs'] case." *Id*. The burden then shifts to Plaintiffs, *id*., and a failure of proof concerning a single element of their claim "necessarily renders all other facts immaterial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). Plaintiffs'

"burden is not a light one." *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010). To defeat Boeing's summary judgment motion, Plaintiffs must come forward with "significant probative evidence" on each element essential to their claim. *Fazio v. City & Cnty. of San Francisco*, 125 F.3d 1328, 1331 (9th Cir. 1997)

## IV.   PLAINTIFFS' REMAINING CLAIM FAILS AS A MATTER OF LAW

Plaintiffs' intentional interference with contractual relations claim should be dismissed because they cannot prove multiple elements of their claim. To survive summary judgment, Plaintiffs must present admissible evidence sufficient to show: (1) a valid contract between plaintiff and a third party; (2) defendant's knowledge of the contract; (3) defendant's intentional acts designed to induce a breach or disruption of the contractual relationship; (4) actual breach or disruption of the contractual relationship; and (5) resulting damage. *Family Home & Fin. Ctr., Inc. v. Fed. Home Loan Mortg. Corp.*, 461 F. Supp. 2d 1188, 1193 (C.D. Cal. 2006) ("*Family Home I*"), *aff'd*, 525 F.3d 822 (9th Cir. 2008) ("*Family Home II*"). Plaintiffs must also prove that Boeing's alleged intentional acts *caused* the breach or disruption. *Id.*; *Franklin v. Dynamic Details, Inc.*, 116 Cal. App. 4th 375, 391 (2004). "[D]isconnected bits of circumstantial evidence" do not suffice. *TYR Sport, Inc. v. Warnaco Swimwear, Inc.*, 709 F. Supp. 2d 802, 820 (C.D. Cal. 2010). Here, Plaintiffs cannot meet their burden to produce evidence on *any* of the following key elements of their claim: (i) that Butler *breached* the Purchase Agreement by "refus[ing] to close the sale," (4AC ¶ 32); (ii) that Boeing *committed the allegedly interfering act* (*i.e.,* by conditioning its remediation of the degreaser pit on Butler contributing $5,000,000 to an environmental escrow account and receiving an "unlimited and continuing" guarantee from Weintraub and Butler); (iii) that Boeing *caused* the breach; or (iv) that Boeing *intended* to cause the breach. Each of these failures alone compels summary judgment in Boeing's favor.

### A.    Butler Did Not Breach Its Contract with Plaintiffs By Refusing to Close the Sale

As the Court previously found (Dkt. 26 at 18), Plaintiffs' claim is premised on the allegation that Boeing's alleged interference caused Butler to "refuse[] to close the sale," thereby resulting in Butler breaching the Purchase Agreement. 4AC ¶ 32.[2] Discovery is closed and the evidence is clear:  Plaintiffs have *no* evidence to create a triable issue on this point. Contrary to Plaintiffs' theory, it was *Plaintiffs*—not Butler—who refused to close the deal. As a result, Plaintiffs are unable to point to any evidence regarding how Butler breached provisions of the Agreement by refusing to close the deal. Moreover, given that Plaintiffs did not provide the funds required on June 3, 2013, Butler was within his rights under the Agreement to terminate escrow. SUF 5, 73. The lack of evidence on this element alone is sufficient grounds to grant summary judgment in Boeing's favor.

### 1.    Plaintiffs Refused to Close the Deal, Not Butler

Contrary to Plaintiffs' theory that Butler breached the Agreement by refusing to close the sale, the evidence demonstrates the opposite: *Plaintiffs* refused to proceed, *not* Butler. Plaintiffs' 30(b)(6) designee, principal, and self-declared most knowledgeable person about the transaction (SUF 74), Mr. Weintraub, testified to this fact under oath:

> Q: So who decided not to close on June 3rd? Was it you or Mr. Butler? . . .
>
> A: Sebitna. S-E-B-I-T-N-A. . . . Chose -- chose not to -- made the decision not to close on June 3rd, 2013.

---

[2] Plaintiffs' interrogatory response numbers 1 and 2 suggest that they may try to argue that Boeing alternatively interfered with their contractual relations with Hopatcong Developers, Lennar, or "others." SUF 70. But Plaintiffs cannot argue this because they did not plead these contracts as a basis for their claim. *See Wasco Prods., Inc. v. Southwall Tech., Inc.*, 435 F.3d 989, 992 (9th Cir. 2006). In any event, Plaintiffs cannot show that they had a valid contract with either of these entities, so the claim would fail. SUF 71; *see Mossimo Holdings, LLC v. Haralambus*, 2017 WL 1240739, at*5-6 (C.D. Cal. Apr. 4, 2017) (granting summary judgment where plaintiff failed to prove a valid contract).

13

SUF 75. This testimony is fatal to Plaintiffs' claim because Plaintiffs cannot show either (i) an actual breach by Butler since Butler was not required to close escrow until Plaintiffs funded it (SUF 5), or (ii) that Boeing caused Butler to breach the Purchase Agreement when it was ***Plaintiffs*** who refused to perform on the contract.

Contemporaneous documents and Mr. Butler's testimony corroborate that it was Plaintiff Sebitna that chose not to close the deal, not Mr. Butler. Indeed, ***after*** Boeing's April 26 proposal that purportedly interfered with their Agreement by "impos[ing] requirements on Weintraub and Butler's business dealings," (4AC ¶ 25), Mr. Butler sent ***three*** letters to Plaintiffs in which he stated he was committed to performing on the contract: "The seller [Butler Enterprises] is ***ready, willing, and able to close the escrow by the required date***." SUF 61 (emphasis added). Mr. Butler then confirmed the same during his deposition in the *Butler* Litigation, testifying that he "wanted to close. All Richard [Weintraub] had to do was close the deal. It would have been done." SUF 78. In fact, Mr. Butler's May 15, 2013, letter even stated that he would agree to extend the escrow period per Plaintiffs' request if Plaintiffs agreed to pay a certain amount, waived claims against Butler, and agreed not to conduct further testing at the Property without Butler's approval—none of which had anything to do with Boeing. SUF 62. ***Plaintiffs*** refused because they were unwilling to waive their claims. SUF. *Id*.

### 2. Plaintiffs Offer No Evidence That Butler Breached the Agreement

In a verified interrogatory response, Plaintiffs averred that the specific provisions Butler breached are 3-7.4, 8-8.1.2, 11, and 31.13 of the Agreement—even though a number of these provisions only impose obligations ***on Plaintiffs***. SUF 79. Nonetheless, Mr. Weintraub, testifying as the Plaintiffs' designated 30(b)(6) witness, could not identify ***a single fact*** supporting Plaintiffs' assertion that Butler breached any of these paragraphs of the Agreement, let alone that Butler's termination of the contract was in breach of these provisions. SUF 80. Nor did Mr. Weintraub present any facts to support that Boeing

14

**DEFENDANT THE BOEING COMPANY'S NOTICE OF MOTION AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

even knew about these provisions, which rendered Plaintiffs' theory that Boeing intended to cause their breach implausible. *Id*.; *see infra* § IV.D.

### 3.    The Purchase Agreement Terminated Pursuant to Its Terms

After Plaintiffs refused to fund the escrow by the closing date, Butler was entitled to terminate the contract according to its terms. SUF 5. In fact, the escrow terminated automatically under the terms of the Purchase Agreement, regardless of Butler's cancellation. *Id*. Specifically, paragraph 14 of the Agreement required Plaintiffs to deposit the $21.5 million cash purchase price by three days before the June 3 closing date. *Id*. Otherwise, under paragraph 8.1.1, the escrow company was required to terminate the escrow, unless the parties agreed in writing to extend the length of escrow. *Id*. And paragraphs 3.2 and 12 additionally gave Butler "the right to terminate escrow based upon [the] Buyer failing to pay any obligation of [the] Buyer when due." *Id*. In accordance with these terms, contemporaneous documents suggest that Mr. Weintraub understood the escrow terminated by June 3, 2013, even before Butler provided a Notice of Termination of the Purchase Agreement on June 4, 2013. SUF 81, 82.

Tellingly, although Plaintiffs sued the Butler Defendants for Butler's breach of the Purchase Agreement in the *Butler* Litigation, they did ***not*** claim in that lawsuit that Butler breached the contract by terminating the escrow, as they do here. Instead, their claim was that Butler breached only paragraphs 6, 23, and 25 by ***failing to deliver the documents that Boeing provided to Plaintiffs*** and making representations and warranties contrary to the information revealed in those documents. SUF 83, 65-67. Thus, in the *Butler* Litigation, far from claiming that Boeing caused Butler's breach of the Purchase Agreement, Plaintiffs submitted evidence and argued that Boeing ***revealed*** Butler's breach of provisions requiring Butler to disclose certain information. *Id*.

Because Plaintiffs cannot prove that Butler breached the Purchase Agreement, they cannot prove a claim against Boeing for interference with that contract. *Davis v. Nadrich*, 174 Cal. App. 4th 1, 10-11 (2009) (granting summary judgment where plaintiff

15

**DEFENDANT THE BOEING COMPANY'S NOTICE OF MOTION AND MEMORANDUM OF
POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

could not prove that the third party breached the contract at issue). A claim for intentional interference with contract does not lie where an agreement terminates by its own terms. *Reyes v. Becker*, 59 F.3d 176, at *2 (9th Cir. 1995) (affirming summary judgment for defendant on an intentional interference with contract claim where contract expired by its own terms). The Court can end its analysis here and grant Boeing's Motion for Summary Judgment on this basis alone. *Davis*, 174 Cal. App. 4th at 10; *see also Integrated Healthcare Holdings, Inc. v. Fitzgibbons*, 140 Cal. App. 4th 515, 533 (2006) (finding plaintiff's interference with contract claim failed for the independent reason that it presented no evidence demonstrating a breach of its existing contract with a third party).

**B.    Plaintiffs Cannot Demonstrate Causation or Interference Because the Alleged Interfering Act Did Not Occur**

To prove their claim, Plaintiffs must also show that a specific act performed by Boeing was: (1) the direct cause of the breach of the Purchase Agreement; and (2) performed with the intent to induce the breach. *Family Home I*, 461 F. Supp. 2d at 1194. Plaintiffs cannot satisfy this element of their claim because they cannot even present evidence that the alleged interfering act ***actually occurred***.

Plaintiffs allege that Boeing interfered with the Purchase Agreement by sending Butler its April 26, 2013, cost sharing proposal in which Boeing purportedly: (1) refused to conduct an environmental investigation and remediation work on the Property unless Butler agreed to put $5,000,000 into an environmental escrow account to fund the remediation for the Property, (Dkt. 22 (Pl. MTD Opp.) at 4-5; *see also* 4AC ¶ 22); and (2) sought a "continuing, unlimited guarantee from Butler and Weintraub" that they would be responsible for future environmental cleanup and remediation should future contamination levels meet requisite cleanup levels (4AC ¶¶ 22, 30). Plaintiffs have subsequently argued without evidence that their contentions are true because the April 26 letter was an "'all or nothing' agreement" (Dkt. 74 at 8). In fact, the uncontroverted evidence demonstrates that Plaintiffs' claims are false:

**DEFENDANT THE BOEING COMPANY'S NOTICE OF MOTION AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

***First***, Boeing's April 26 letter did ***not*** "require" Butler to obtain a $5 million account (4AC ¶ 22); rather, it was an initial proposal that Boeing offered to negotiate:

- The cover letter to the April 26 proposal, captioned "Boeing's Proposal," described the enclosure as "a set of proposed deal points," invited "any questions" or "discuss[ion of] this proposal," and noted Boeing's "offer to undertake the requested work," which included Boeing's willingness to investigate areas that were not its sole responsibility, (SUF 48);

- On May 28, Boeing met with Mr. Butler regarding Boeing's April 26 proposal. During that meeting, Mr. Butler was "receptive to the Boeing 4/26 proposal," and Boeing confirmed with Butler that it did ***not*** require a $5,000,000 escrow deposit and "could be flexible with the value of the account," (SUF 51); and

- Boeing's corporate representative, Arthur Lenox, testified that the April 26 proposal was Boeing's "initial draft, subject to more discussions with Mr. Butler," SUF 85. He also explained that the purpose of the escrow was to ensure it would reimbursement for work performed on behalf of Butler. SUF 86.

***Second***, Boeing did not "refuse" to conduct investigation and remediation at the Property unless Butler agreed to the terms of the April 26 proposal; rather, Boeing committed to and in fact performed investigation in preparation for remediation both before and after the April 26 proposal:

- Boeing began investigating the potential environmental impacts before it sent its April 26 proposal, and continued to do so without Butler's agreement to put $5,000,000 into an environmental escrow account afterwards, (SUF 87, 88, 50-54);

- On May 9, 2013, Mr. Weintraub wrote to Mr. Butler that Plaintiffs "understand that Boeing is prepared to remedy the environmental issues that are its responsibility, at its cost." SUF 89;

- On June 16, 2015, Plaintiffs submitted to the state court in the *Butler* Litigation that "Boeing repeatedly asserted" that it was "*responsible for a **particular section***

**DEFENDANT THE BOEING COMPANY'S NOTICE OF MOTION AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

*of the Property*, not the remaining areas, and specifically not the area operated by Catalina Yachts." SUF 90;[3] and

- Boeing's corporate representative, Mr. Lenox, testified that Boeing was, "from the beginning, . . . committed to taking care of the degreaser area. It was not connected with the escrow account. . . . [T]he escrow account was put aside, requested so that if Rockwell, Boeing, encountered Catalina Yacht[s]' contamination, then we would be reimbursed for it." SUF 91.

***Third***, contrary to Plaintiffs' claim, Boeing did not seek any commitment ***from Plaintiffs*** in its April 26 proposal, much less a continuing, unlimited guarantee from them for future environmental cleanup and remediation:

- The April 26 proposal did not propose any commitment from Plaintiffs whatsoever, (SUF 45, 92);

- Mr. Weintraub's June 8, 2013 sworn declaration confirmed Plaintiffs' understanding that the April 26, 2013, letter proposed that Boeing and Catalina Yachts "split the responsibility for the environmental cleanup regarding the Property (with each party being responsible for the areas of contamination they likely caused, and then sharing costs regarding the remaining areas) and further proposed that Catalina Yachts deposit $5 million in escrow to be used towards remedial efforts related to Catalina Yachts' responsibility." (SUF 93); and

- Mr. Weintraub testified as Plaintiffs' representative that he could not identify any specific requirement for Plaintiffs to put up money in the April 26 proposal, that the proposal was addressed to Mr. Butler and not Mr. Weintraub, and that Plaintiffs' expectation was that Butler would be liable for the part of any contamination for which Butler was responsible. SUF 94.

In the face of this evidence, Plaintiffs cannot raise a genuine dispute in support of their claim that Boeing refused to commit to or conduct investigation or remediation unless Butler contributed $5,000,000 to an escrow account, or that Boeing sought a "continuing,

---

[3] *Labertew v. Chartis Prop. Cas. Co.*, 363 F. Supp. 3d 1031, 1041 (D. Ariz. 2019) (quoting *Christian Legal Soc. v. Martinez*, 561 U.S. 661, 716 (2010)) ("[S]tatements made in pleadings are considered judicial admissions and are 'conclusively binding on the party who made them.'")

**DEFENDANT THE BOEING COMPANY'S NOTICE OF MOTION AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

unlimited guarantee" from Plaintiffs. Plaintiffs thus cannot even show that the alleged interfering act actually occurred.

### C.    Boeing Did Not Cause Butler to Breach the Purchase Agreement

While the Court does not need to reach causation, Plaintiffs' claim also fails for the independent reason that Plaintiffs cannot show that Boeing's alleged interfering act *caused* Butler to breach the Purchase Agreement— that is, that absent Boeing's conduct, Plaintiffs and Butler would have concluded the transaction. "It has been repeatedly held that a plaintiff seeking to hold one liable for unjustifiably inducing another to breach a contract, must allege . . . that the contract would otherwise have been performed." *Stereoscope, LLC v. U.S. Bank Nat'l Ass'n*, 675 F. App'x 725, 726 (9th Cir. 2017) (quoting *Hahn v. Diaz–Barba*, 194 Cal. App. 4th 1177, 1196 (2011)); *see also Dryden v. Tri–Valley Growers*, 65 Cal. App. 3d 990, 997 (1977) (The plaintiff "must allege that the contract would otherwise have been performed, and that it was breached and abandoned by reason of the defendant's wrongful act and that such act was the moving cause thereof.").[4, 5] Plaintiffs cannot satisfy their burden to create a triable issue regarding

---

[4] *See also Wynn v. Nat'l Broadcasting Co., Inc.*, 234 F. Supp. 2d 1067,1121-22 (C.D. Cal. 2002) (dismissing claim for tortious interference because plaintiffs failed to allege that third party "would have performed had [the defendants] not interfered"); *Nat'l Funding, Inc. v. Commercial Credit Counseling Services, Inc.*, 2018 WL 6444899, at *5 (C.D. Cal. Nov. 6, 2018) (same).

[5] There is a split in authority in this Circuit regarding the test for causation in the context of a claim for intentional interference with contract. Citing an earlier Ninth Circuit case, some courts employ a "substantial factor test for determining causation," instead of the but-for rule of causation discussed above. *See, e.g., Baez v. Pension Consulting Alliance, Inc.*, 2018 WL 1942389, at *4 (C.D. Cal. Mar. 16, 2018) (quoting *Bank of N.Y. v. Fremont Gen. Corp.*, 523 F.3d 902, 909 (9th Cir. 2008)). However, "[t]he substantial factor standard generally produces the same results as does the 'but for' rule of causation." *Rutherford v. Owens-Illinois, Inc.*, 16 Cal. 4th 953, 969 (1997). The substantial factor test requires Plaintiffs to prove that their alleged harm would not "have been sustained in the absence of [the defendant's] conduct." *Baez*, 2018 WL 1942389, at *4. For the reasons discussed herein, regardless of the test applied, Plaintiffs cannot proffer sufficient evidence to create a triable issue regarding causation.

**DEFENDANT THE BOEING COMPANY'S NOTICE OF MOTION AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

causation where, as here, the evidence shows that the relationship between the contracting parties "soured" separate from the alleged interfering act. *Stereoscope*, 675 F. App'x at 726 (affirming dismissal of intentional interference with contract claim for lack of causation where the contracting parties' relationship "soured" for unrelated reasons).

Here, Mr. Butler plainly testified in the *Butler* Litigation that his relationship with Plaintiffs "soured" for "a lot" of reasons having nothing to do with Boeing. SUF 95. Specifically, he testified that Mr. Weintraub "kept on lying to me that they were going to give [missing pages from Plaintiffs' Phase II environmental report] to me. I never did get them . . . . And things like this, *it just really soured the deal* . . ." SUF 96. In addition, Mr. Butler testified that Plaintiffs "always wanted another extension"; they "wouldn't give [Mr. Butler a] good, straight answer" about the status of the Phase II investigation; the deal "was taking too long"; and Plaintiffs did "not . . . keep[] [Mr. Butler] informed on what's going on" despite having promised to do so. SUF 97.

Mr. Butler further testified that he ultimately declined to grant Plaintiffs another extension of the escrow period because Mr. Weintraub "threaten[ed] to sue" him. SUF 63. Moreover, Mr. Butler testified that *Boeing was not a factor in this decision*. SUF 98 ("Q: Didn't you tell Mr. Weintraub that you weren't going to give him an extension because you needed to go work things out with Boeing? A: No."). Mr. Butler's testimony is corroborated by contemporaneous documents, Plaintiffs' submissions to the state court, and Mr. Weintraub's 30(b)(6) testimony—all of which show that Butler was willing to extend escrow if Plaintiffs paid a fee, waived claims against Butler, and did not conduct further testing at the Property without Butler's consent, but Plaintiffs refused. SUF 62.

Indeed, Plaintiffs themselves have maintained that their deal with Butler soured for reasons unrelated to any conduct by Boeing, as evidenced by their argument and proof in the *Butler* Litigation. In that action, Plaintiffs claimed that Butler caused the deal to fail by defrauding Plaintiffs and breaching the Purchase Agreement through a series of "misrepresentations and omissions" regarding Catalina Yachts' use of chemicals. SUF

**DEFENDANT THE BOEING COMPANY'S NOTICE OF MOTION AND MEMORANDUM OF
POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

99. Plaintiffs asserted that Mr. Butler's misrepresentations included "that Catalina Yachts had never used TCE" and "that the likely source of contamination, if any, was either Rocketdyne or a neighborhood dry cleaner," and his omissions included "that there may in fact have been contamination by Catalina Yachts on the Property, including . . . a chemical spill of TCE." SUF 100, 101. Plaintiffs further represented to the state court that they did not perform on the Purchase Agreement on June 3, 2013, without any mention of Boeing:

> Mr. Butler's misrepresentations and omissions triggered the need for Plaintiffs to conduct further investigation of the Property to go forward with the planned financing. [The Butler] Defendants attempted to leverage this need, ***which was created entirely by their own breaches, misrepresentations and omissions***, to avoid performing under the Agreement and with the plan to sell the Property, with the Entitlements, to someone else at a higher price than agreed upon with Plaintiffs.

SUF 102 (emphasis added). Plaintiffs presented evidence to support these claims and survived the Butler Defendants' motion for summary judgment. SUF 69. These representations, which are "considered judicial admissions and are 'conclusively binding'" on Plaintiffs, *Labertew*, 363 F. Supp. 3d at 1041, are fatal to any effort by Plaintiffs to show that their alleged harm would not have been sustained in the absence of Boeing's conduct, as they must to sustain their claim here, *Baez*, 2018 WL 1942389, at *4. Nor do Plaintiffs have evidence to show that the environmental escrow account proposed in Boeing's April 26 letter proximately caused Butler to breach the contract in any event.

In sum, even aside from the facts that Butler's termination of the Purchase Agreement was not a breach of the contract (*see supra* § IV.A) and that the alleged interfering act did not occur (*see supra* § IV.B), summary judgment is appropriate because Plaintiffs do not have sufficient evidence to show that the environmental escrow account proposed in Boeing's April 26 letter was even a factor in Butler's termination of the contract—let alone that Plaintiffs and Butler would have performed on the Purchase

Agreement absent the alleged interference. Plaintiffs thus cannot show that Boeing caused any breach of the Purchase Agreement, which provides an independently sufficient basis for this Court to grant summary judgment for Boeing.

**D.    Plaintiffs Also Do Not Have Evidence Sufficient to Show that Boeing Intentionally Induced a Breach**

To succeed on a contractual interference claim, it is "essential" for a plaintiff to show that the defendant "intended to induce the breach; if its 'actions were not intended to induce a breach, [it] cannot be held liable.'" *Family Home I*, 461 F. Supp. 2d at 1193 (quoting *Kasparian v. Cnty of Los Angeles*, 38 Cal. App. 4th 242, 261 (1995)). On this ground, as well, Plaintiffs' evidence falls short. To demonstrate intent, Plaintiffs must present evidence establishing that Boeing "had a specific intent to interfere with a contract" or "knew that the interference was certain or substantially certain to occur as a result of its action." *SIC Metals, Inc. v. Hyundai Steel Co.*, 442 F. Supp. 3d 1251, 1256 (C.D. Cal. 2020) ("*SIC I*"), *aff'd*, 838 F. App'x 315 (9th Cir. 2021) ("*SIC II*") (quoting *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1154 (2003)). "It is not enough that the actor intended to perform the acts which caused the result—he or she ***must have intended to cause the result itself***." *Kasparian*, 38 Cal. App. 4th at 261 (emphasis added); *Family Home II*, 525 F.3d at 826 ("A necessary element of [a plaintiff's] claim is proof that [the defendant's] action was designed to accomplish interference."); *Korea Supply Co.*, 29 Cal. 4th at 1155-56 (plaintiffs must prove that the defendant knew that interference of the contractual relationship was "a necessary consequence" of the allegedly interfering act). Typically, this requires a plaintiff to prove conduct by the defendant akin to "advising, counseling and persuading termination of a contract." *Rosenfeld v. Cohen*, 146 Cal. App. 3d 200, 221 (1983), *disapproved of on other grounds*, 7 Cal. 4th 503 (1994). Here, Plaintiffs cannot point to any evidence that Boeing did anything designed to accomplish interference with the Purchase Agreement. *Family Home II*, 525 F.3d at 826.

As an initial matter, Plaintiffs must—but cannot—prove that Boeing was sufficiently aware of the details of the Purchase Agreement to have determined that its April 26 proposal would have caused Butler to terminate the contract. *Davis*, 174 Cal. App. 4th at 10-11 (affirming summary judgment in defendant's favor because plaintiff "has not brought forth any facts to show that [the defendant] was sufficiently aware of the details of the [contract at issue] to form an intent to harm it.").[6] For example, in *Winchester Mystery House, LLC v. Global Asylum, Inc*, the plaintiff informed the defendant that it had a contract with a third party that gave the third party "exclusive rights" to its story, but did not identify the party or provide a more specific description of the terms. 210 Cal. 4th 579, 597 (2012). The California Court of Appeals affirmed the trial court's decision to grant the defendant's summary judgment motion because the defendant "could not have determined" based on this limited information that "producing and distributing its film would interfere with plaintiff's contractual obligation to provide exclusive story rights" to a third party. *Id*.

Likewise, the evidence shows that the only information Boeing had regarding the Agreement when it sent its April 26 proposal was that the Agreement existed and that the escrow was scheduled to close approximately 60 days after the April 19 meeting. SUF 103. There is no evidence that Boeing had any knowledge of any term related to ***Butler's*** performance or obligations under the Agreement. Accordingly, as in *Davis* and *Winchester Mystery*, there is no basis to find that Boeing somehow designed the April 26 proposal to cause Butler to refuse to close the sale, as Plaintiffs claim.

While Boeing's lack of knowledge of the specifics of the contract is sufficient to find that Boeing did not intend to interfere with it, there are more reasons. ***First***, there is no direct evidence of an intent to interfere by Boeing. It is an uncontroverted fact that Boeing never said or even suggested to Butler that it should not fulfill its contractual

---

[6] *See* Rest. 2d Torts § 766 (The defendant "must have knowledge of the contract with which [it] is interfering and of the fact that [it] is interfering with the performance.").

**DEFENDANT THE BOEING COMPANY'S NOTICE OF MOTION AND MEMORANDUM OF
POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

obligations under the Purchase Agreement. *Compare TYR Sport*, 709 F. Supp. 2d at 819-20 (granting summary judgment for defendants because there was no "direct evidence" that defendants induced the breach and the "circumstantial evidence" was insufficient to show that defendant urged the third party to breach); and *Family Home II*, 525 F.3d at 825-26 (same, but finding the circumstantial evidence was insufficient to prove that defendant's "action was designed to accomplish interference."). **Second**, Plaintiffs do not have circumstantial evidence from which a reasonable jury could find that Boeing's April 26 proposal was intended to cause Butler to breach the Purchase Agreement—particularly given Boeing's offers to negotiate and be "flexible" on the terms of the proposal (SUF 51) and Mr. Lenox's testimony that the April 26 letter was provided at Mr. Weintraub's request to facilitate the deal (SUF 104). *See TYR Sport*, 709 F. Supp. 2d at 819-20.

In sum, Plaintiffs cannot satisfy their burden to show Boeing intentionally induced Butler to breach the Purchase Agreement. Therefore, Boeing is entitled to summary judgment on Plaintiffs' claim on this independent ground as well.

## V.   BOEING CANNOT BE LIABLE WHEN IT WAS ACTING IN ITS LEGITIMATE BUSINESS INTERESTS

The Court does not need to reach the merits of Boeing's affirmative defense because Plaintiffs cannot carry their burden to create a genuine issue of material fact as to multiple elements of their one remaining claim. Nevertheless, Plaintiffs' intentional interference claim is also barred because the undisputed facts establish that Boeing acted in its legitimate business interest in its interactions with Plaintiffs and Butler, including when it proposed a cost-sharing agreement with Butler to remediate a property for which it appeared they were jointly responsible. Quite simply, Boeing wanted to ensure it would not perform work on behalf of another party without reimbursement for that work.

A claim for interference with contract is defeated by the "affirmative defenses of 'justification' and 'privilege.'" *Cabanas v. Gloodt Assocs.*, 942 F. Supp. 1295, 1306 (E.D. Cal. 1996); *SIC I*, 442 F. Supp. 3d at 1257. Under California law, "if a defendant's

**DEFENDANT THE BOEING COMPANY'S NOTICE OF MOTION AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

'conduct was lawful and undertaken to enforce its rights,' it cannot be held liable for intentional interference with a contract even if it knew that such conduct might interrupt a third party's contract." *SIC I*, 442 F. Supp. 3d at 1256; *see also*, *Quelimane Co. v. Stewart Title Guaranty Co.*, 19 Cal. 4th 26, 56 (1998) (quoting Restat. 2d of Torts, § 766, com. j at p. 12).

California courts thus routinely dismiss contractual interference claims where a defendant legitimately enforces its own rights, and in so doing, indirectly disrupts a plaintiff's contractual relationship. *SIC I*, 442 F. Supp. 3d at 1258.  For example, in *SIC I,* the court granted summary judgment on the plaintiff's claim because the "downstream harm to [the plaintiff] was purely incidental to [the defendant] legitimately enforcing its own" rights. *Id*.  Although the court found that the defendant's actions were a substantial factor in causing the breach, the court explained that the plaintiff's claim failed as a matter of law because the defendant acted as a "reasonable business would," and that "[i]t would be patently unfair" to hold defendant liable for contractual interference. *Id.* at 1259.

Similarly, in *Weststeyn Dairy 2 v. Eades Commodities Company*, the court granted summary judgment on plaintiff's contractual interference claim based on the justification defense. 280 F. Supp. 2d 1044, 1088-1089 (E.D. Cal. 2003). The defendant lender had demanded prepayment of a merchant/borrower's pay-over accounts even though the defendant knew that its demand would harm the merchant's contract with the plaintiff purchaser. *Id.* at 1088. The court found that the defense of economic privilege or justification applied because the defendant "was entitled to seek and obtain the prepayments" in its own interest.  *Id.* at 1089.[7]

---

[7] *See also Cabanas*, 942 F. Supp. at 1306 (granting summary judgment on intentional interference claim because the bank was entitled to protect its own interests); *Computer Place, Inc. v. Hewlett-Packard Co.*, 607 F. Supp. 822, 835 (N.D. Cal. 1984), *aff'd*, 779 F.2d 56 (9th Cir. 1985) (granting summary judgement on interference claim because manufacturer had the right act in its own interest even if it interfered with contract).

Like the defendants in *SIC I* and *Weststeyn Dairy*, Boeing cannot be liable for interference because it was pursuing its legitimate business interest when it sent its April 26 proposal, as discussed in detail above, *supra* § II.D. In short:

- ***First***, Boeing acted cooperatively from the outset. Despite having no connection with the Property for decades when Mr. Butler reached out in late 2012, Boeing promptly sought to determine: (i) what environmental impacts had been detected on the Property; (ii) the sources of those impacts and whether any were attributable to Rocketdyne; and (iii) the parameters of the work being requested from Boeing. SUF 28.

- ***Second***, the Phase I and Phase II Reports and agency records indicated that Catalina Yachts contributed to contamination at the Property, as Plaintiffs admitted in the *Butler* Litigation. SUF 43, 105. Indeed, Butler admitted to potentially contributing to contamination at the Property. SUF 40.

- ***Third,*** in April 2013, the data available regarding potential impacts on the Property was limited and the sources were unknown. SUF 14-16, 108, 109. Despite the fact that Boeing "had very little information" at the time, Butler requested that Boeing lead the remediation and investigation work, including for areas beyond the degreaser area where Rocketdyne operated. SUF 32, 34.

- ***Fourth***, the undisputed facts show that Boeing's cost-sharing proposal was, as Boeing described it at the time, simply an initial "set of proposed deal points" that Boeing expected to negotiate. SUF 48. Indeed, Boeing and Mr. Butler's first meeting regarding the proposal was "positive," Mr. Butler "seemed receptive to the Boeing 4/25 proposal," and Boeing confirmed that it did not require a $5,000,000 escrow deposit and "could be flexible with the value of the account." SUF 51. Further, even though Butler never agreed to the cost-sharing proposal terms, Boeing continued to cooperate with Butler and undertook an investigation and remediation of soil impacts attributable to Rocketdyne. SUF 54.

All told, the evidence shows that Boeing's cost-sharing proposal was a reasonable, common sense effort by Boeing to protect its legitimate business interest. *See SIC I*, 442 F. Supp. 3d at 1257 (there is no liability for interference where the defendant "is endeavoring to advance some interest of his own"). It would be "patently unfair" for Boeing to have been required to assume responsibility for investigation and remediation of the entire Property when Boeing did not know (i) the extent of the environmental

DEFENDANT THE BOEING COMPANY'S NOTICE OF MOTION AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

impacts on the Property; (ii) who was responsible for those impacts; or (iii) what requirements the Water Board would impose. *Id.* at 1254-55. There is no genuine dispute that Boeing acted at all times in its legitimate business interests. Accordingly, for this independent reason, Plaintiffs' intentional interference claim should be dismissed.

## VI.    CONCLUSION

For the foregoing reasons, the Court should grant Boeing's motion for summary judgment.


DATED:  June 17, 2022                    Respectfully submitted,


                                        */s/ Tammy A. Tsoumas*
                                        Tammy A. Tsoumas
                                        Matthew Summers
                                        Leonora A. Cohen


                                        *Attorneys for Defendant*
                                        THE BOEING COMPANY

**DEFENDANT THE BOEING COMPANY'S NOTICE OF MOTION AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**